**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KARL BRYANT EVANS,** | : | **Civil No.  1:20-CV-1148** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security**[1] | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

I.   **Introduction**

The Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Karl Bryant Evans applied for supplemental security income under Title XVI of the Social Security Act on February 5, 2015, alleging an amended onset date of August 2, 2013. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Evans was not disabled during the period of time between August 2, 2013 and July 22, 2016, but that Evans became disabled on July 22, 2016 and remained disabled through the date of the decision, October 6, 2017. Prior to the hearing before the ALJ, Evans filed a claim for disability benefits under Title II, alleging an onset date of disability of June 1, 2013 and presenting with a date last insured of December 31, 2013. A hearing was held on this claim on January 17, 2019, and on April 1, 2019, the ALJ found that Evans was not disabled between June 1, 2013 and December 31, 2013 and denied Evans' application for benefits.

Evans now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019), we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   <u>Statement of Facts and of the Case</u>

Evans filed his Title II claim for disability benefits on February 23, 2017. On January 17, 2019, Evans appeared before an ALJ, alleging an onset date of June 1, 2013, and his date last insured was December 31, 2013. (Tr. 10). Evans alleged disability due to carpal tunnel syndrome, arthritis in his hands, back pain, and leg pain. (Tr. 209). His disability form stated that he had a 9th grade education and could write more than his name in English. (Tr. 209-10).

Evans underwent surgery in May of 2009 to correct bulging discs as a result of a work-related accident in 2006. (Tr. 266). Thereafter, Evans began treating for back pain and hand pain in January of 2012 with Dr. James Kim, D.O. (Tr. 466). Dr. Kim noted that his hand pain was mostly early arthritic pain. (Tr. 465). Treatment records indicate that Evans' back pain stemmed his 2009 surgery. (<u>Id.</u>) These notes also indicated that Evans experienced chronic opiate dependence for pain management. (<u>Id.</u>) Dr. Kim recommended home exercises and pain medication, which Evans reported kept him functional. (<u>Id.</u>) Physical examinations between

January and May of 2012 indicated that Evan's muscle strength was 5/5 in shoulders, elbow flexors, and grips. (Tr. 463-66).

Evans underwent EMG studies in July of 2012. A July 6, 2012 EMG showed findings that suggested Evans had severe left carpal tunnel syndrome, moderate left Guyon's canal syndrome, and severe left cubital tunnel syndrome. (Tr. 462). A July 17, 2012 EMG indicated that Evans also suffered from severe right carpal tunnel syndrome and mild to moderate right cubital tunnel syndrome. (Tr. 460). Dr. Kim referred Evans for an orthopedic evaluation of his hand and elbows but noted that Evans was not using a wrist splint. (Tr. 458). Evans continued to treat with Dr. Kim for his back and upper extremity pain, but Dr. Kim's physical examinations during this time showed largely normal findings with 5/5 muscle strength in Evans' upper extremities. (Tr. 446-57). In addition, Dr. Kim's recommended treatment was relatively conservative, with recommendations of home exercise and pain medication. (Id.)

In May of 2013, Dr. Kim's treatment notes indicated that Evans was still experiencing pain in his hands, but that "he want[ed] to hold off from carpal tunnel surgery." (Tr. 443). Dr. Kim also noted that Evans' pain medication was keeping him functional. (Id.) Although treatment notes indicate Evans was still suffering hand pain, his muscle strength was 5/5 in his upper extremities upon examination.

4

(Tr. 444). In August, October, and December of 2013, Evans followed up with Dr. Kim primarily for back pain, and it was noted that while he was experiencing some pain and numbness due to his carpal tunnel syndrome, his muscle strength was 5/5 in his upper extremities upon examination. (Tr. 435-41). Throughout the brief relevant time period encompassed by this claim, Dr. Kim noted that Evans wanted to hold off on surgery, and thus he recommended home exercises and pain medication to alleviate Evans' pain. (Tr. 435-43).

Evans continued to treat with Dr. Kim after his insured status expired in December of 2013. Thus, in March of 2014, Dr. Kim noted that Evans was experiencing increased back pain after a slip and fall on ice. (Tr. 431). Again, upon examination Evans' muscle strength in his upper extremities was a 5/5, and the majority of his complaints related to his back pain. (Tr. 432). Treatment notes from March to December of 2014 show that Evans was continuing to experience back pain and also shoulder pain, but that his upper extremity examinations were largely normal. (Tr. 420-31). Indeed, Dr. Kim continued to recommend home activities and exercise, as well as pain medication that was managing Evans' pain. (Id.) It was also noted in a May 2014 note that Evans was not using his splint for his carpal tunnel syndrome. (Tr. 325). In February 2015, Dr. Kim noted that Evans' was still

5

experiencing carpal tunnel symptoms, predominantly on his right side, but that he still was not interested in surgery. (Tr. 415).

In March of 2016, Dr. Kim filled out a lumbar spine medical source statement. (Tr. 330-33). Dr. Kim opined that Evans' limitations from his back and shoulder pain rendered him essentially unable to perform any kind of work. (Id.) Dr. Kim noted that these limitations applied since the plaintiff's surgery in 2009. (Tr. 333). In 2017, Dr. Kim filled out another form opining on the plaintiff's abilities to do physical work-related activities. (Tr. 484-86). In this 2017 statement, Dr. Kim opined that Evans was unable to perform any significant amount of physical activity due to his back and shoulder pain, and that Evans was essentially totally disabled. (Id.)

Dr. Catherine Smith, M.D., a state agency physician, reviewed Evans' claim for disability benefits. (Tr. 488-95). Dr. Smith opined that Evans could lift/carry 20 pounds occasionally and 10 pounds frequently; could stand/walk and sit 6 of 8 hours in a workday; and had no pushing or pulling limitations. (Tr. 489). As for his postural limitations, Dr. Smith opined that Evans could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, but could never climb ladders, ropes, or scaffolds. (Tr. 490). No manipulative, visual, or communicative limitations were established. (Tr. 491). Dr. Smith also reviewed the medical source statements from

Dr. Kim and opined that these opinions limited Evans much more than the treatment records for the disability period indicated. (Tr. 494). Further, a state agency psychologist, Dr. Paul Taren, PhD., opined that the plaintiff's learning disorder was not a severe impairment. (Tr. 497).

It is against this medical backdrop that the ALJ held a hearing on Evans Title II claim on January 17, 2019. (Tr. 10, 137). At the hearing, both Evans and a Vocational Expert testified. (Tr. 10). By a decision dated April 1, 2019, the ALJ denied Evan's application for benefits. (Tr. 7-24).

In that decision, the ALJ first concluded that Evans had not engaged in any substantial gainful activity from the alleged onset date of June 1, 2013 through the date last insured of December 31, 2013. (Tr. 13). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Evans had the following severe impairments: degenerative disc disease of the lumbar spine, status post-surgery, failed back syndrome, bilateral carpal tunnel syndrome, cubital tunnel syndrome, left Guyon's tunnel syndrome, borderline intellectual functioning, and a learning disability. (Tr. 13). Additionally, the ALJ found that opiate dependance was a nonsevere impairment because it did not cause any ongoing functional work-related limitations. (Id.) The ALJ noted that Evans had documented additional limitations but found them to be non-medically determinative during the relevant

time period because they occurred after the relevant time period: left shoulder bursitis, right biceps tendinitis, right rotator cuff syndrome, bilateral epicondylitis, and right trochanteric bursitis. (Id.) At Step 3, the ALJ determined that Evans did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 13-16). The ALJ specifically considered Listings 1.02, 1.03, 12.05 and 12.11. (Tr. 13).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity (RFC), considering Evan's limitations from his impairments:

> After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR § 404.1567(a) except: He required a cane for ambulation, with occasional stooping, kneeling, and crouching, with no ladders, ropes or scaffolds, at jobs that are simple and routine, generally described as unskilled, with no requirement to do reading and allowing for instructions verbally, and no requirement for more than simple math skills.

(Tr. 16).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Evans' testimony regarding his impairments. The ALJ first noted Evans' long history of back pain, as well as his history of hand and arm pain. (Tr. 17). It was noted that throughout the relevant period, Evans' treatment for his pain was conservative and consisted of home exercise and medication, and that most of Evans' complaints to Dr. Kim related to

8

his low back. (Id.) Moreover, with regard to Evans' shoulder pain, the ALJ stated that these complaints did not begin until after the date last insured and were outside the relevant time period. (Id.) Additionally, the ALJ recognized Evans' borderline intellectual functioning, but noted that he had clear adaptive functioning. (Id.) On this score, the ALJ reasoned that Evans had lived independently and assisted in raising children. (Id.)

The ALJ then considered the medical statements from Dr. Kim and gave them little weight. (Tr. 18). The ALJ noted that these statements were check-box forms and concluded that Dr. Kim's statements were a gross overstatement of Evans' limitations. (Id.) On this score, the ALJ recognized that treatment notes consistently indicated that Evans' strength testing was normal and examination consistently showed good strength in the bilateral upper extremities, and that Dr. Kim's findings of weakness were not noted in the longitudinal treatment records. (Id.) The ALJ also recognized that Dr. Kim included Evans' limitations from his shoulder impairment in his assessment, but the shoulder impairment began after the date last insured. (Id.) Further, the ALJ noted that Dr. Kim's assessment provided no basis for his findings other than vaguely noting that the limitations were supported by physical exam. (Id.)

The ALJ considered a statement from Dr. Quartararo, who performed Evans' back surgery in 2009, which indicated that Evans was prohibited from returning to

9

his prior work. (Id.) However, the ALJ noted that Dr. Quartararo provided no specific functional limitations other than suggesting that Evans look for other work. (Id.) In addition, the ALJ considered the assessments of the state agency consultants, whose opinions suggested that Evans could perform light work, and the ALJ gave these opinions partial weight. (Id.) On this score, the ALJ actually provided greater limitations than suggested by these medical assessments, limiting Evans to sedentary work due to his need for a cane and his back pain. (Id.)

Finally, with regard to Evans' learning disability and borderline intellectual functioning, the ALJ considered the opinions of Dr. Taren, the state agency consultant, and Dr. Hamidian, who rendered an opinion in 2009. (Id.) The ALJ recognized that Dr. Hamidian's opinion was prior to the date of onset of disability, but also recognized that this opinion indicated that Evans could work despite his borderline intellectual functioning. (Id.) Dr. Taren's assessment was given little weight, given that the ALJ found Evans to have a severe mental impairment. (Id.)

The ALJ also considered Evans' testimony. Evans testified that he had back surgery in 2009, and that he continued to suffer from back and leg pain. (Tr. 17). He testified that he could sit for 15-20 minutes and stand or walk for 20-25 minutes. (Id.) He reported that he was not good at math or reading and that he was in special education classes in school. (Id.) He also stated that he never had a driver's license

10

and that his fiancé did all of the grocery shopping. (Id.) The ALJ ultimately found

that Evans' statements were not consistent with the medical evidence of record. (Id.)

Having arrived at this RFC assessment, the ALJ found at Step 4 that Evans

was unable to return to his past relevant work as a factory worker, a line worker, a

shipper, a set-up man, and a laborer. (Tr. 19). Between Step 4 and Step 5, the ALJ

concluded that Evans had a limited education and could communicate in English.

(Id.) The ALJ specifically noted that at the time that he filed his application, Evans

indicated that he could read and understand English and could write more than his

name in English. (Id.) The ALJ also indicated that although Evans initially stated

that he had completed 9th grade, he testified that he had only finished 8th grade. (Id.)

Lastly, the ALJ indicated that two prior decisions had found Evans to have a limited

education and that he was capable of communicating in English. (Id.) Thus, the ALJ

concluded that the totality of the evidence supported a finding that Evans could

communicate in English and had a limited education. (Id.)

The ALJ then made a finding at Step 5 that Evans could perform work

available in the national economy as an inspector, a scanner, or an assembler. (Tr.

20-21). In doing so, the ALJ considered the Medical Vocational Guidelines—

specifically Rule 201.19—due to the fact that Evans was not able to perform all of

the exertional demands of sedentary work. (Tr. 20). In addition, the ALJ posed

hypothetical questions to a vocational expert at the hearing to determine if an individual of Evans' age, education, work experience, and RFC. Specifically, the ALJ asked the VE if an individual such as Mr. Evans had limitations to frequent gross and fine manipulation with the bilateral extremities could perform these sedentary work jobs, and the VE responded that those jobs would still remain. (Tr. 123). However, when asked if the individual was limited to occasional bilateral gross and fine manipulation, the VE responded that the prior sedentary jobs mentioned would not remain. (Id.)

Accordingly, the ALJ concluded that Evans did not meet the stringent standard for disability set by the Act and denied his claim. (Tr. 21). Evans filed a request for review on May 28, 2019. (Tr. 183-85). The Appeals Council denied this request.  (Tr. 1-6).

This appeal followed. (Doc. 1). On appeal, Evans contends that the ALJ erred in several respects when denying his disability claim, including: failing to include any limitations as to the use of his hands despite a finding that carpal tunnel syndrome was a severe impairment; rejecting the opinion of the treating physician without good reason; basing the RFC on his lay opinion; failing to include all limitations in the hypothetical question to the vocational expert; and failing to find that Evans was illiterate. (Doc. 16, at 4-5). Additionally, in a footnote, Evans alleges

that the ALJ erred in deferring to the findings of the ALJ who granted Evans' Title XVI claim, as that ALJ issued her decision at a time when she did not have a valid appointment pursuant to the Appointments Clause. (Doc. 16, at 13 n.4).

This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   Discussion

### A.   Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir.

13

1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial

review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20

C.F.R. §404.1505(a).  To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R.

§§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the

18

proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment

of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence

20

standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

     **C.**    <u>**Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence**</u>

The Commissioner's regulations also set standards for the evaluation of medical evidence and define medical opinions as "statements from acceptable medical sources that reflect judgments about the nature and severity of [the plaintiff's] impairments, including [the plaintiff's] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairments, and [the plaintiff's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).[2] Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. § 404.1527(c).

---

[2] Because Evans filed his disability application prior to March 27, 2017, the regulations in effect prior to March 27, 2017 are applicable here.

In deciding what weight to accord to competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. § 404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. § 404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant

Case 1:20-cv-01148-MCC   Document 21   Filed 10/01/21   Page 23 of 33

evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

At the initial level of administrative review, State agency medical and psychological consultants may act as adjudicators. See SSR 96-5p, 1996 WL 374183 at *4. As such, they do not express opinions; they make findings of fact that become part of the determination. Id. However, 20 C.F.R. § 404.1527(e) provides that at the ALJ and Appeals Council levels of the administrative review process, findings by non-examining state agency medical and psychological consultants should be evaluated as medical opinion evidence. Therefore, ALJs must consider these opinions as expert opinion evidence by nonexamining physicians and must address these opinions in their decisions. SSR 96-5p, 1996 WL 374183 at *6. Opinions by state agency consultants can be given weight "only insofar as they are supported by evidence in the case record." SSR 96-6p, 1996 WL 374180 at *2. In appropriate circumstances, opinions from nonexamining state agency medical consultants may be entitled to greater weight than the opinions of treating or examining sources. Id. at *3.

23

Oftentimes, as in this case, an ALJ must evaluate medical opinions and records tendered by both treating and non-treating sources. Judicial review of this aspect of ALJ decision-making is guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or state agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, "[w]here, . . . , the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

### D.   **The ALJ's Decision was Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large

24

or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Evans was not disabled. Therefore, we will affirm this decision.

Evans first challenges the ALJ's decision by arguing that the ALJ did not include limitations in the RFC regarding Evans' carpal tunnel syndrome. In the same vein, Evans contends that the ALJ improperly discounted Dr. Kim's opinion and instead crafted an RFC that was not supported by any medical opinion. However, we find that the ALJ adequately explained the weight given to the various medical opinions in the record and explained how those opinions factored into his RFC determination in light of the objective medical evidence.

At the outset, we note that the question of disability is a legal determination and is not wholly dictated by medical opinions. Indeed, it is well settled that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical

25

opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

Here, the ALJ explained that he gave Dr. Kim's statements little weight for several reasons. First, the ALJ noted that the majority of Dr. Kim's treatment records indicated that Evans' primary impairment was his back pain. In addition, while Evans complained of pain in his hands, the recommended treatment of home exercises and pain medication was conservative, and Dr. Kim's records noted that Evans was not wearing a wrist splint for his carpal tunnel and did not want to undergo surgery. Further, as the ALJ stated, Dr. Kim's assessment was primarily based on Evans' back and shoulder pain, and the shoulder impairment began after the date last insured. Overall, given the longitudinal treatment records, the ALJ concluded that Dr. Kim's statements, which were rendered years after the relevant time period, were an overstatement of Evans' limitations. The ALJ also gave partial weight to the assessments of the state agency consultants, who opined that Evans could perform light work. The ALJ reasoned that due to Evans' back pain and his use of a cane, Evans needed to be limited to sedentary, rather than light work. The ALJ also considered Evans' testimony but concluded that his subjective complaints were not consistent with the medical record.

On this score, the ALJ was confronted by several medical opinions, which including varying limitations based on the plaintiff's physical impairments. The ALJ considered all of these opinions against the objective medical evidence in the record and explained why some weight was given to certain opinions and why he found the opinions inconsistent with the medical evidence. The ALJ further considered the plaintiff's subjective complaints against the objective medical evidence and concluded that the evidence was not consistent with Evans' alleged level of limitation. We again note that "[t]he ALJ – not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Moreover, the ALJ's evidentiary evaluation was supported by substantial evidence; that is, " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek, 139 S. Ct. at 1154.  Accordingly, we find that the ALJ considered all of the medical evidence and the plaintiff's subjective complaints and adequately explained his reasoning for the weight given to the various medical opinions in this case to determine the range of sedentary work Evans could perform.

In a similar vein, Evans argues that the ALJ erred because he did not include all of Evans' physical limitations in the hypothetical to the VE, specifically regarding Evans' carpal tunnel pain. However, as we have explained, the ALJ

concluded that the medical record did not support a finding that Evans was limited

because of his carpal tunnel syndrome. On this score, it is well settled that a

hypothetical to the VE must include all of the claimant's "credibly established

limitations." Rutherford, 399 F.3d at 554 (citing Plummer v. Apfel, 186 F.3d 22, 431

(3d Cir. 1999)). However, the ALJ is not required to submit to the vocational expert

every impairment alleged by a claimant. Id. "[S]uch references to 'all impairments'

encompass only those that are medically established." Id. Here, the ALJ explained

that he did not find that Evans was limited due to his carpal tunnel syndrome based

on the medical evidence in the record, which showed normal physical examinations

and normal muscle strength in his upper extremities during the relevant period.

Accordingly, the ALJ was not required to include any such limitations in the

hypothetical to the VE. The ALJ did, however, ask the VE if an individual such as

Mr. Evans had limitations to frequent gross and fine manipulation with the bilateral

extremities could perform these sedentary work jobs, and the VE responded that

those jobs would still remain. (Tr. 123). However, when asked if the individual was

limited to occasional bilateral gross and fine manipulation, the VE responded that

the prior sedentary jobs mentioned would not remain. (Id.) Ultimately, the ALJ

concluded that the medical evidence did not support a finding of any manipulative

limitations and did not include those limitations in his RFC. Given that the ALJ

adequately explained this conclusion, we find that substantial evidence supports this RFC decision.

Evans also asserts that the ALJ erred when the ALJ did not find Evans disabled because he is illiterate. Evans contends that the ALJ should have considered him disabled under 20 C.F.R. § 404.1564(b)(1), which states that a person is illiterate "if the person cannot read or write a simply message such as instructions or inventory lists even though the person can sign his or her name." We first note that the plaintiff did not allege in his disability report that he was illiterate, but rather brought the issue up for the first time at the 2019 hearing. (Tr. 120). Evans testified that he dropped out of ninth grade and that that he never learned to read in school, but also testified that he was able to read little sentences, such as directions on a box of food. (Tr. 117-18). However, in his decision, the ALJ concluded that the totality of the evidence—including prior hearings and disability reports—indicated that Evans was able to communicate in English. (Tr. 19). Indeed, in his disability report, Evans specifically stated that he could read and understand English and write more than just his name. (Tr. 208-09).

On this score, we cannot conclude that the ALJ's decision was erroneous. There is no evidence in the record that would support a finding of illiteracy as defined by the regulations. Rather, Evans conceded that he was able to read and write

in English. In addition, the record includes a note handwritten by Evans in cursive writing. (Tr. 193). Accordingly, we find that the ALJ's determination that Evans could communicate in English is supported by substantial evidence.

Finally, Evans asserts that his case should be remanded because the ALJ who issued a partially favorable decision in 2017 was not properly appointed pursuant to the Appointments Clause. See Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018); Cirko v. Comm'r of Soc. Sec., 948 F.3d 148 (2020). Evans claims that because the ALJ who decided this claim in 2019, who was properly appointed, made reference to the fact that the improperly appointed ALJ's decision encompassed the relevant time period, his case must be remanded. We disagree.

In Cirko, the Court of Appeals held that Social Security cases that were decided by an improperly appointed ALJ—that is, an ALJ who was not appointed by the President, a court of law, or a head of a department—must be remanded for a hearing in front of a properly appointed ALJ. Cirko, 948 F.3d at 152. Following the Supreme Court's decision in Lucia, which held that the ALJs of the SEC were not properly appointed, the Acting Commissioner of Social Security reappointed the agency's ALJs. See Exec. Order No. 13,843, 83 Fed. Reg. 32,755 (July 13, 2018). The holding in Cirko led to a rising tide of case law in this circuit remanding Social Security appeals to the Commissioner for a new hearing before an ALJ who has been

properly appointed under the Appointments Clause to the United States Constitution.
See e.g., Dove-Ridgeway v. Saul, 2020 WL 1506119, at *1 (D. Del. Mar. 30, 2020);
Tate v. Saul, 2020 WL 1443492, at *1 (E.D. Pa. Mar. 19, 2020); Burke v. Saul, 2020
WL 1042422, at *2 (E.D. Pa. Mar. 4, 2020); Anderson v. Saul, 2020 WL 814927, at
*1 (M.D. Pa. Feb. 18, 2020); Walker v. Saul, 2020 WL 996420, at *1 (E.D. Pa. Feb.
28, 2020); Sanchez v. Saul, 2020 WL 430811, at *1 (E.D. Pa. Jan. 28, 2020);
Simmons on behalf of A.B. v. Saul, 2020 WL 470304, at *1 (E.D. Pa. Jan. 29, 2020).

However, we cannot conclude that the facts of this case compel a remand.
Rather, it is undisputed that the decision rendered in 2019 and challenged in this
appeal was rendered by a properly appointed ALJ. Moreover, it is clear from the
ALJ's decision that any deference to the 2017 decision was not germane to the
outcome of this decision or this appeal. Indeed, Evans challenges the 2019 decision
based on the ALJ's alleged failure to consider limitations from his carpal tunnel
syndrome, which the ALJ in fact considered based on an independent review of the
medical evidence in the relevant time period. Accordingly, we cannot conclude that
this case should be remanded, as it was decided by a properly appointed ALJ.

On the facts as outlined above, the ALJ found that Evans had not met the
stringent standard for disability set by law. It is the right and responsibility of the
ALJ to make such assessments and we find that substantial evidence supported the

31

ALJ's decision in the instant case.   Thus, at bottom, it appears that Evans is requesting that this Court re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). Because we cannot re-weigh the evidence, and because we find that the ALJ properly articulated that substantial evidence did not support this disability claim, we will affirm the ALJ's decision in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting de novo might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability

determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

IV.   **<u>Conclusion</u>**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

Submitted this 1st day of October, 2021.


<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge